FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

OCT 1 4 2016

JUDGE CHARLES R. NORGLE
U.S. District Court Judge

UNITED STATES OF AMERICA

v.

ASIF A. ASLAM

No. 14 CR 287-4

Judge Charles R. Norgle

## **PLEA AGREEMENT**

1.　This Plea Agreement between the United States Attorney for the Northern District of Illinois, ZACHARY T. FARDON, and defendant ASIF A. ASLAM, and his attorney, MICHAEL C. GOODE, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure. The parties to this Agreement have agreed upon the following:

### **Charges in This Case**

2.　The indictment in this case charges defendant with bank fraud, in violation of Title 18, United States Code, Section 1344 (Counts Four to Six, Eight, Twelve, and Thirteen) and making false statements to a financial institution, in violation of Title 18, United States Code, Section 1014 (Count Seven).

3.　Defendant has read the charges against him contained in the indictment, and those charges have been fully explained to him by his attorney.

4.　Defendant fully understands the nature and elements of the crimes with which he has been charged.

## Charge to Which Defendant Is Pleading Guilty

5.    By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the following count of the indictment: Count Four, which charges defendant with bank fraud, in violation of Title 18, United States Code, Section 1344.

## Factual Basis

6.    Defendant will plead guilty because he is in fact guilty of the charge contained in Count Four of the indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt:

Beginning not later than March 2007, and continuing through at least in or about July 2012, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant Asif A. Aslam, along with co-defendant Warren N. Barr, III, and others knowingly participated in a scheme to defraud a financial institution, including Wells Fargo Bank, N.A., and to obtain money and funds owned by and under the custody and control of a financial institution by means of materially false and fraudulent pretenses, representations, and promises.

Specifically, defendant Aslam was the chief executive officer of Aslam Group, Inc., and an officer of Downtown Property Management, LLC. In or around late 2007, defendant Aslam met with co-defendant Barr at one of Barr's sales offices in Chicago. Co-defendant Barr was a real estate developer, and had developed a condominium building at 1255 South State Street in Chicago, Illinois called Vision

on State. During the meeting, defendant Aslam agreed to assist co-defendant Barr with the sale of the approximately 80 remaining units for sale at Vision on State.

Beginning in late 2007, defendant Aslam recruited buyers to purchase condominium units at Vision on State using fraudulently obtained mortgage loans from Wells Fargo Bank, N.A. and other financial institutions and nonbank lenders. As part of those transactions, defendant Aslam knew that the sales prices of the condominium units were falsely inflated so that the buyers' mortgage loans covered co-defendant Barr's costs, the buyers' down payment and other buyer incentives, and payments to defendant Aslam. Defendant Aslam knew that the inflated sales prices, and the payments to the buyers and to Aslam, were not disclosed to the lenders financing the mortgage loans.

Defendant Aslam knew that fraudulent loan applications for buyers were submitted to lenders in order to qualify the buyers for mortgage loans. Defendant Aslam knew that the loan applications contained false statements regarding: (a) the sales price; (b) the buyers' source of down payment; and (c) the buyers' intention to occupy the properties. The information submitted in loan application packages, and the supporting documents, was material to the lenders' decision whether to fund a mortgage loan and to successor lenders and institutions in deciding whether to purchase a mortgage loan on the secondary market.

Defendant Aslam knew that the documents submitted in support of the mortgage loans were fraudulent. For example, defendant Aslam knew that the real estate contracts submitted for these transactions falsely inflated the sales price and,

3

in some cases, the identity of the buyers because the purported buyer was a straw buyer. Defendant Aslam also knew that the HUD-1 settlement statements contained false and fraudulent information regarding: (a) the sales price; (b) the source of the buyers' down payment; (c) the seller, 13th and State, LLC, which was controlled by co-defendant Barr, having provided funds to buyers in order to purchase the condominium units; and (d) defendant Aslam, individually and through his companies, Aslam Group, Inc., Downtown Property Management, LLC, and Royalty Development & Investment Group, Inc., having received payments in connection with the closing of the condominium units, which Aslam either retained for his own use or used to pay the buyers' homeowners' assessments and closing costs.

In total, defendant Aslam caused buyers to fraudulently obtain approximately 60 mortgage loans totaling approximately $20,770,493 to purchase condominium units. Lenders incurred losses on the mortgage loans totaling at least approximately $11,395,503 as follows: AmTrust Bank ($193,800), Bank of America ($4,539,210), CitiMortgage ($244,965), Countrywide Savings Bank FSB ($156,300), Fannie Mae ($192,000), Freddie Mac ($1,843,277), Guaranteed Rate, Inc. ($1,064,451), and Wells Fargo Bank, N.A. ($3,161,500).

### Sale of Units 1312 and 1805

Prior to April 24, 2008, defendant Aslam recruited Buyer C to purchase two condominium units at Vision on State, units 1312 and 1805, from co-defendant Barr's company, 13th and State, LLC. Defendant Aslam knew that the sales prices

4

for units 1312 and 1805 were falsely inflated in order to obtain mortgage loans that covered co-defendant Barr's costs, the buyer's down payment and other incentives paid to the buyer. Defendant Aslam also knew that the loan applications contained false information regarding Buyer C's employment and income as well as the sales prices, all of which was material to the lenders' decisions whether to fund the mortgage loans.

Defendant Aslam knew that co-defendant Barr had provided the down payments for the purchase of units 1312 and 1805. Between April 17, 2008 and April 25, 2008, defendant Aslam received approximately $762,000 by wire transfer from 13th and State, LLC into an account controlled by Aslam at Chase Bank. On or about April 24, 2008, defendant Aslam used a portion of the approximately $762,000 to purchase cashier's checks, showing that Buyer C was the remitter, for Buyer C to use as the down payment to purchase units 1312 and 1805. Defendant Aslam caused Buyer C to be listed as the remitter on the checks to make it appear to the lender, and the title company, that Buyer C had purchased the checks and was the source of the down payment. Defendant Aslam provided the two cashier's checks to another individual to give to Buyer C to use as the down payment to purchase units 1312 and 1805. Defendant Aslam knew that the HUD-1 settlement statements for the sale of units 1312 and 1805 did not disclose that the buyers' down payment had been provided by 13th and State, LLC.

On or about April 24, 2008, Buyer C closed on the sale of units 1312 and 1805. Defendant Aslam knew that Buyer C purchased units 1312 and 1805 using

the proceeds of fraudulently obtained mortgage loans, which included an approximately $385,988 loan from Well Fargo Bank, N.A. for the purchase of unit 1312. Wells Fargo Bank, N.A. was a financial institution, and its deposits were insured by the Federal Deposit Insurance Corporation.

On or about April 24, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant Aslam knowingly executed and attempted to execute the scheme to defraud by causing Wells Fargo Bank, N.A. to fund a loan in the amount of approximately $385,988 to Buyer C to purchase 1255 South State Street, Unit 1312 in Chicago, Illinois, in violation of Title 18, United States Code, Section 1344.

7.    Defendant, for purposes of computing his sentence under Guideline § 1B1.2, stipulates to having committed the following additional offense:

Beginning not later than June 2008, and continuing through at least approximately in or about March 2009, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant Aslam, along with Jeffrey J. Budzik and others, knowingly participated in a scheme to defraud a financial institution, namely, AmTrust Bank, Bank of America, CitiMortgage, HSBC, and Wells Fargo Bank, and others, and to obtain money and funds owned by and under the custody and control of a financial institution by means of materially false and fraudulent pretenses, representations, and promises.

Specifically, in or around June 2008, defendant Aslam and Budzik met with individuals who were developing and selling units at a newly constructed

6

condominium, Development A, in Chicago. During the meeting, defendant Aslam learned that the developers were having difficulty selling multiple units and paying off their construction loan. Defendant Aslam agreed to recruit buyers to purchase units from Development A at inflated prices. With Defendant Aslam's assistance, the buyers would then rent the units to others. In exchange, Development A agreed to pay defendant Aslam substantial fees that Aslam knew would be used to make the buyers' down payments and to support a "guaranteed rent program" in order to enrich and benefit Aslam and the buyers.

Defendant Aslam knew that the buyers fraudulently obtained mortgage loans to purchase units in Development A. Defendant Aslam knew that the down payment checks used by buyers to purchase the units falsely listed the buyers as the remitters of funds for down payments when, in fact, the funds had been obtained from Aslam. Defendant Aslam knew that the true source of the down payment was concealed from the lenders on the HUD-1 settlement statements. In addition, Aslam and others knew that certain of the HUD-1 settlement statements failed to disclose the payments to Aslam, including a settlement statement submitted to CitiMortgage on or about August 28, 2008, that failed to disclose payments of approximately $125,000 that the developer was paying to Aslam for services that included recruiting Buyer OT to purchase Unit 902 at Development A. The deposits of CitiMortgage were insured by the Federal Deposit Insurance Corporation and information about the payments to Aslam and the source of the buyers' down payments was material to CitiMortgage and other lenders.

Aslam and others caused buyers to fraudulently obtain approximately eleven mortgage loans with a value of approximately $4,800,000 to purchase condominium units at Development A. Aslam acknowledges that the lenders suffered losses of approximately $2,739,338 as follows: AmTrust ($175,500), Wells Fargo ($621,654), HSBC Mortgage Corporation ($196,250), CitiMortgage ($204,000), and Bank of America ($1,541,934).

On or about August 28, 2008, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant Aslam and others knowingly executed and attempted to execute the scheme by causing CitiMortgage to fund a loan in the amount of approximately $304,000 for Buyer OT to purchase Unit 902 at Development A, in violation of Title 18, United States Code, Section 1344.

8.    The foregoing facts are set forth solely to assist the Court in determining whether a factual basis exists for defendant's plea of guilty, and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crimes and related conduct.

## Maximum Statutory Penalties

9.    Defendant understands that the charge to which he is pleading guilty carries the following statutory penalties:

a.    A maximum sentence of 30 years' imprisonment. Pursuant to Title 18, United States Code, Section 3561, defendant may not be sentenced to a term of probation for this offense. This offense also carries a maximum fine of $1,000,000, or twice the gross gain or gross loss resulting from that offense,

8

whichever is greater. Defendant further understands that the judge also may impose a term of supervised release of not more than five years.

b.    Defendant further understands that the Court must order restitution to the victims of the offense in an amount determined by the Court.

c.    In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on the charge to which he has pled guilty, in addition to any other penalty or restitution imposed.

### Sentencing Guidelines Calculations

10.    Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

11.    For purposes of calculating the Sentencing Guidelines, the parties agree on the following points:

a.    **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2015 Guidelines Manual.

b.    **Offense Level Calculations**.

i.    The counts of conviction are grouped pursuant to Guideline § 3D1.2(d).

9

    ii.    The base offense level is 7, pursuant to Guideline § 2B1.1(a)(1).

    iii.    The offense level is increased 20 levels, pursuant to Guideline § 2B1.1(b)(1)(K), because the combined loss amount due to the offense conduct and stipulated offense is approximately $14,134,841, which is more than $9,500,000 and is less than $25,000,000.

    iv.    Defendant acknowledges that the loss amount and therefore the offense level and Guideline range may increase as additional losses are realized from the fraudulent transactions in which defendant participated.

    v.    The offense level is increased 2 levels, pursuant to Guideline § 2B1.1(b)(10)(C), because the offense of conviction and stipulated offense involved sophisticated means and defendant intentionally engaged in or caused the conduct constituting sophisticated means.

    vi.    Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine or restitution that may be imposed in this case, a two-level reduction in the offense level is appropriate.

vii.     In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.



c.     **Criminal History Category**. With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant's criminal history points equal zero and defendant's criminal history category is I.

d.     **Anticipated Advisory Sentencing Guidelines Range**. Therefore, based on the facts now known to the government, the anticipated offense level is 26, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory sentencing guidelines range of 63 to 78 months' imprisonment, in addition to any supervised release, fine, and restitution the Court may impose.

e.     Defendant and his attorney and the government acknowledge that the above guidelines calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional guidelines provisions apply

11

in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

f. Both parties expressly acknowledge that this Agreement is not governed by Fed. R. Crim. P. 11(c)(1)(B), and that errors in applying or interpreting any of the sentencing guidelines may be corrected by either party prior to sentencing. The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the guidelines. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Agreement, on the basis of such corrections.

## Cooperation

12. Defendant agrees he will fully and truthfully cooperate in any matter in which he is called upon to cooperate by a representative of the United States Attorney's Office for the Northern District of Illinois. This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil, or

12

administrative proceeding. Defendant agrees to the postponement of his sentencing until after the conclusion of his cooperation.

### Agreements Relating to Sentencing

13.    At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation. If the government determines that defendant has continued to provide full and truthful cooperation as required by this Agreement, then the government shall move the Court, pursuant to Guideline § 5Kl.l, to depart downward from the low end of the applicable guideline range, and shall recommend a sentence that includes a term of imprisonment in the custody of the Bureau of Prisons of 66 percent of the low end of the applicable guideline range. Defendant shall be free to recommend any sentence. Defendant understands that the decision to depart from the applicable guideline range rests solely with the Court.

14.    If the government does not move the Court, pursuant to Guideline § 5K1.1, to depart from the applicable guideline range, as set forth above, the preceding paragraph of this Agreement will be inoperative, both parties shall be free to recommend any sentence, and the Court shall impose a sentence taking into consideration the factors set forth in 18 U.S.C. § 3553(a) as well as the Sentencing Guidelines without any downward departure for cooperation pursuant to § 5K1.1. Defendant may not withdraw his plea of guilty because the government has failed to make a motion pursuant to Guideline § 5K1.1.

15.    It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw his guilty plea.

16.    Regarding restitution, defendant acknowledges that the total amount of restitution owed to the victims is $11,395,503 as follows, AmTrust Bank ($193,800), Bank of America ($4,539,210), CitiMortgage ($244,965), Countrywide Savings Bank FSB ($156,300), Fannie Mae ($192,000), Freddie Mac ($1,843,277), Guaranteed Rate, Inc. ($1,064,451), and Wells Fargo Bank, N.A. ($3,161,500), minus any credit for funds repaid prior to sentencing, and that pursuant to Title 18, United States Code, Section 3663A, the Court must order defendant, together with any jointly liable co-defendants, to make full restitution in the amount outstanding at the time of sentencing.

17.    Defendant also agrees to pay additional restitution, arising from the Stipulated Offense conduct set forth above totaling $2,739,338 as follows, AmTrust ($175,500), Wells Fargo ($621,654), HSBC Mortgage Corporation ($196,250), CitiMortgage ($204,000), and Bank of America ($1,541,934), pursuant to Title 18, United States Code, Section 3663(a)(3) and 3664.

18.    Restitution shall be due immediately, and paid pursuant to a schedule to be set by the Court at sentencing. Defendant acknowledges that pursuant to Title 18, United States Code, Section 3664(k), he is required to notify the Court and the

14

United States Attorney's Office of any material change in economic circumstances that might affect his ability to pay restitution.

19.     Defendant agrees to pay the special assessment of $100 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

20.     Defendant agrees that the United States may enforce collection of any fine or restitution imposed in this case pursuant to Title 18, United States Code, Sections 3572, 3613, and 3664(m), notwithstanding any payment schedule set by the Court.

21.     After sentence has been imposed on the count to which defendant pleads guilty as agreed herein, the government will move to dismiss the remaining counts of the indictment, as well as the forfeiture allegation as to defendant.

### Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

22.     This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 14 CR 287-4.

23.     This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States

15

Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

### Waiver of Rights

24. Defendant understands that by pleading guilty he surrenders certain rights, including the following:

a. **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

i. The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii. If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii. If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt

16

beyond a reasonable doubt and that it was to consider each count of the indictment separately. The jury would have to agree unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

iv.      If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

v.      At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

vi.      At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

vii.      At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

b.      **Waiver of appellate and collateral rights**. Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. Defendant is aware that Title 28, United States

Code, Section 1291, and Title 18, United States Code, Section 3742, afford a defendant the right to appeal his conviction and the sentence imposed. Acknowledging this, if the government makes a motion at sentencing for a downward departure pursuant to Guideline § 5K1.1, defendant knowingly waives the right to appeal his conviction, any pre-trial rulings by the Court, and any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, and including any order of restitution, in exchange for the concessions made by the United States in this Agreement. In addition, if the government makes a motion at sentencing for a downward departure pursuant to Guideline § 5K1.1, defendant also waives his right to challenge his conviction and sentence, and the manner in which the sentence was determined, in any collateral attack or future challenge, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness or ineffective assistance of counsel, nor does it prohibit defendant from seeking a reduction of sentence based directly on a change in the law that is applicable to defendant and that, prior to the filing of defendant's request for relief, has been expressly made retroactive by an Act of Congress, the Supreme Court, or the United States Sentencing Commission.

25.    Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

18

**Presentence Investigation Report/Post-Sentence Supervision**

26.     Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope, and extent of defendant's conduct regarding the charges against him, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing, including the nature and extent of defendant's cooperation.

27.     Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

28.     For the purpose of monitoring defendant's compliance with his obligations to pay a fine and restitution during any term of supervised release to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's

individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

### Other Terms

29.    Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine and restitution for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

30.    Defendant understands that pursuant to Title 12, United States Code, Sections 1785(d) and 1829, his conviction in this case will prohibit him from directly or indirectly participating in the affairs of any financial institution insured by the National Credit Union Share Insurance Fund or the Federal Deposit Insurance Corporation, except with the prior written consent of the National Credit Union Administration Board or the FDIC and, during the ten years following his conviction, the additional approval of this Court. Defendant further understands that if he knowingly violates this prohibition, he may be punished by imprisonment for up to five years, and a fine of up to $1,000,000 for each day the prohibition is violated.

31.     Defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense to which defendant is pleading guilty. Removal and other immigration consequences are the subject of a separate proceeding, however, and defendant understands that no one, including his attorney or the Court, can predict to a certainty the effect of his conviction on his immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his guilty plea may entail, even if the consequence is his automatic removal from the United States.

### Conclusion

32.     Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

33.     Defendant understands that his compliance with each part of this Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or

21

defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

34.     Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

35.     Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

36.   Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: _October 14, 2016_

_Zachary T. Fardon by JY_
_____
ZACHARY T. FARDON
United States Attorney

_Kenneth E. Yeadon_
_____
SARAH J. NORTH
KENNETH E. YEADON
Assistant U.S. Attorneys

_____
ASIF A. ASLAM
Defendant

_Michael C. Goode_
_____
MICHAEL C. GOODE
Attorney for Defendant

23