1       IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
2                 EASTERN DIVISION

3

UNITED STATES OF AMERICA,        )
4                                )
                    Plaintiff,   )
5                                )   No. 14 CR 287
            vs.                  )   Chicago, Illinois
6                                )   November 4, 2020
ASIF ASLAM,                      )   11:30 a.m.
7                                )
                    Defendant.   )
8

9          TRANSCRIPT OF PROCEEDINGS - SENTENCING

10        BEFORE THE HONORABLE CHARLES R. NORGLE

11   APPEARANCES:

12   For the Plaintiff:        HON. JOHN R. LAUSCH, JR.
                               UNITED STATES ATTORNEY
13                             219 South Dearborn Street
                               Chicago, Illinois 60604
14                             BY:  MS. SARAH J. NORTH

15   For the Defendant:        LAW OFFICE OF MICHAEL C. GOODE
                               221 North LaSalle Street
16                             Chicago, Illinois 60601
                               BY:  MR. MICHAEL C. GOODE
17

18   ALSO PRESENT:            Ms. Meredith Clifton, US Probation

19

20

21

22   Official Court Reporter:  JENNIFER COSTALES, CRR, RMR, CRC
                               219 S. Dearborn St., Room 2342
23                             Chicago, Illinois 60604
                               (312) 435-5895
24                             *jenny.uscra@yahoo.com*

25

1          (Proceedings in open court)

2               THE CLERK:  14 CR 287, United States versus Asif

3     Aslam; sentencing.

4               MS. NORTH:  Good morning, Your Honor.  Sarah North on

11:32:39    5     behalf of the United States.

6               THE COURT:  Good morning, counsel.

7               MR. GOODE:  Good morning, Judge Norgle.  Michael

8     Goode, G-O-O-D-E, on behalf of the defendant Asif Aslam.

9     Mr. Aslam is present before the Court.

11:32:53   10               THE COURT:  Okay.  The Probation officer?

11               PROBATION OFFICER:  Good morning, Your Honor.

12     Meredith Clifton on behalf of Probation standing in for

13     Danielle Stern.

14               THE COURT:  Good morning.

11:33:04   15               All right.  Would you ask your client to step up and

16     be sworn.

17               Mr. Fulbright, please swear in the witness.

18               THE DEFENDANT:  Good morning, Your Honor.

19               THE CLERK:  Raise your right hand.

11:33:17   20          (Defendant duly sworn)

21               THE DEFENDANT:  I do.

22               THE COURT:  I have before me what I think is the last

23     report from the Probation department, which goes back to

24     January 24th, 2017, which contains the recommendations.  And

11:33:41   25     there was also a report, a supplemental report going back to

1    May 9, 2017.

2          But with respect to Probation, is this the latest

3    available information regarding the defendant in this case

4    going back to 2017?

5          PROBATION OFFICER:  That is the most recent document

6    that was provided to me for today.

7          THE COURT:  Thank you, counsel.

8          Mr. Goode, you have received this, all this

9    information, including the recommendation of the Probation

10   department?

11         MR. GOODE:  I have received the documents, Your

12   Honor.

13         THE COURT:  Okay.

14         MR. GOODE:  Can I add something to the Court?

15         THE COURT:  Yes.

16         MR. GOODE:  I think one of the reasons that there may

17   not be supplemental information subsequent to that date is

18   because about that time, the Pretrial Services officer that my

19   client Mr. Aslam had been reporting to told him that he is at

20   the lowest of the lowest risk and that he need not report

21   anymore because she had not had so much as one single incident

22   to discuss with him.  And she then -- they made him report in

23   on an online basis that they set up for him.

24         So there has been very little contact with Pretrial

25   Services because he's done so well in the several years that

1    predated that event.

2         THE COURT:  All right.  I don't want to get ahead of

3    ourselves here.

4         Has the government received as well the

11:35:04    5    recommendation of the Probation department going back to 2017?

6         MS. NORTH:  Yes, Your Honor.

7         THE COURT:  Does the government have a motion here

8    for 5K1 downward departure?

9         MS. NORTH:  We do, Your Honor.  We do so move and ask

11:35:15   10    that the Court depart downward from the lowest end of the

11    advisory guidelines range, which we agree with Probation is 63

12    to 78 months' imprisonment, which would be a downward

13    departure to a sentence of 42 months.

14         THE COURT:  All right.  Mr. Goode, you may argue on

11:35:37   15    behalf of your client with respect to what you feel an

16    appropriate and fair sentence would be.

17         MR. GOODE:  Yes, Your Honor.  Judge, could I ask that

18    my client sit down?  He's on -- he has 11 stents, has had 4

19    heart attacks and he's on medication, which I'll get into in a

11:35:55   20    minute.

21         THE COURT:  I read that in the report and I intended

22    to get into it as well.  But please be seated.

23         MR. GOODE:  Thank you.

24         THE DEFENDANT:  Thank you, sir.

11:36:01   25         MR. GOODE:  Thank you, Judge.  Also gives me a little

1     more room this way.

2          THE COURT:  Yes.

3          MR. GOODE:  Judge, I won't belabor the Court with a

4     recitation of what my client has pled guilty to.  Simply put,

5     he's admitted to having committed fraud.

6          I will take issue and umbrage with the report, the

7     government's report indicating the gigantic amount of money.

8     And I will say this, that the timing also of the entire scheme

9     that my client was a piece of may have lasted as long as is

10    indicated, I think from '07 to '12, but as the government

11    knows, Asif Aslam came into this situation in October/November

12    of 2007 and was out of it by October/November of 2008.

13         My client is an intelligent, highly educated man.  He

14    should have known better, no question about it.

15         When my client was first called in to the U.S.

16    Attorney's office, the assistant and I sat down at the

17    meeting, and from the get go Mr. Aslam never denied anything.

18    He confessed.  He admitted.  He cried.  I sat with him in

19    meetings with the FBI and AUSA as he not only said every

20    possible thing that he himself had been involved in, but he

21    answered every question, looked up information for them, wore

22    a wire.

23         I was there when he participated in phone calls with

24    the FBI and the AUSA.  He did everything he could possibly be

25    expected to do and more.

1    I was told by the FBI and by Chris McFadden that when

2    they called him, he responded.  I came with him on five

3    occasions, the shortest of which was three hours, the longest

4    was about five and a half, during which time he went over

11:39:07    5    thousands of pages of records so that he could explain what he

6    understood and knew about the situation.

7    So as far as his cooperation, I know the government

8    has made the recommendation of the three point departure, and

9    I'm very grateful to them.  But I want the Court to know he

11:39:25    10    deserves every bit of that and more, because he really did put

11    himself at risk.  He wore a wire against two other attorneys

12    that were involved with Warren Barr, and he did participate in

13    providing all of the information he could have been expected

14    to.

11:39:39    15    But be that as it may, the amount of money that is

16    alleged in here which gave rise to the 26 points arrived at by

17    the government is exaggerated greatly.  With Warren Barr's

18    entire scenario, Warren Barr was quite a well-known man, and

19    his tentacles into different deals extended greatly.  My

11:40:08    20    client wasn't involved in that.

21    My client's involvement was simply this:  He lost his

22    job, he needed work, he took a job working for a man who he

23    was introduced to by another gentleman, and he was told that

24    this man, Warren Barr, was a senior vice-president at Inland

11:40:23    25    Realty, a big company, a real big company.  They have a good

1    reputation according to my client.  And he went to work for

2    Warren Barr, he started selling condominium units in different

3    developments around the city of Chicago.

4         Warren Barr's program, though, was sketchy, to use a

11:40:41    5    word my client used.  And that sketchy means that my client

6    was suspicious and knew better and should have known better

7    and said, I'm out of here, because if something looks sketchy

8    or it looks too good to be true or it looks weird, everybody's

9    mother tells them, That's when you start looking twice.

11:41:01    10   My client asked Warren Barr, when he was told that

11   Warren Barr's people were putting up the down payments for the

12   acquisition of these condo units, Warren Barr said:  Oh, no.

13   It's totally fine.  Everything is okay.

14        My client said:  Well, then why are we putting

11:41:13    15   information that's different on the HUD loan?

16        Warren Barr said:  Look, I'm telling you it's all

17   right.

18        And he called in Budzik and Lattas, two Illinois

19   lawyers at the time that worked for Warren Barr, and they sat

11:41:24    20   down with Asif.  And he told this to Chris and to the FBI.

21   And they said:  Listen, you are wrong, that's not the law

22   anymore.  You don't have to do that.  There is little

23   variations.  Don't worry about it.

24        So my client continued through about 55 to almost 60

11:41:41    25   of these transactions, selling condo units with money that was

1    put down by Warren Barr, not by the buyers.  My client knew

2    that was wrong.  But he let himself be convinced that, okay,

3    either we can get around this or whatever because of Budzik

4    and Lattas.

11:41:57    5    Finally, my client went to Warren Barr, and McFadden

6    knew this, we went over the whole thing with him because he

7    went out and talked to the lawyer I mentioned now, which you

8    and I both know, Judge, Warren Barr took him out to Joe

9    DiNatale.  Joe, who I've known for 40 years, is an honest and

11:42:18    10   honorable man.

11   So from what I was told by Joe DiNatale, who also

12   told this to the FBI and Chris McFadden, Warren Barr came to

13   Joe DiNatale and said:  I need you to tell this kid that's

14   working for me that what we are doing is on the okay.

11:42:35    15   Joe DiNatale said:  I can't do that because what you

16   just described is illegal, and I can't tell him it's true,

17   it's good, because it's not.

18   That's the kind of guy Joe DiNatale is.  He's a

19   standup guy.

11:42:49    20   So they left Joe DiNatale's office without Warren

21   Barr bringing my client in to talk to him, because Warren

22   didn't want Joe DiNatale to tell my client Asif the truth.

23   So my client goes back and that starts the thinking,

24   why did we come out here to meet this lawyer to tell me what

11:43:07    25   is really going on and not meet him.

So my client does more digging, realizes his suspicions were accurate.  He knew they were doing the wrong thing and he got out of it, stopped it.

It doesn't nullify or negate the fact that he participated for about 11 months in a scheme that he knew or should have known was absolutely improper, which is why in the end my client entered a plea.

And, you know, at the time I even thought about maybe this should have been an Alford plea because there were issues about my client's position.  My client kept telling me, No, I should have walked out of there from the beginning.  He said, I put myself here.

So what happened after that?  My client lost his job.  Four days after the plea was entered, it hits the Internet and there was some small press around it.  My client had a nice job.  He had an MBA.  He had just been accepted to Harvard graduate school for a second MBA.  That door got shut, too.

My client lost that job and went through a succession of jobs, seven or eight jobs.  The minute they would find out what had happened, he's out.

He even took a job driving Uber.  I have the letter with me from Uber, which I turned in before, Uber telling him, You're out of here.  And it was because he was convicted of bank fraud.

He got a job selling used cars.  They fired him

1   because he provided -- he made application and they told him,

2   Okay, you've got to apply for a license.  He went in and he

3   told them the truth.

4           He told his Pretrial Services officer every place he

5   had gone to he was always straight and truthful about what had

6   happened.  The minute people look at his apps, Hit the road.

7           So this has nullified his incredible education,

8   brought it down to a dilute zero.  Tremendous punishment, but

9   he brought it on himself.  I understand that.

10          You know, it's like a Greek tragedy.  The Greeks

11  don't destroy a common man.  You make a man greater and then

12  it becomes all the more tragic in his loss.

13          But this gentleman here has not only lost a job, he

14  had a home here.  He wanted to start anew.  His family,

15  everybody had pretty much walked away from Asif.  So he moved

16  to California, tried to get work out there.  Nothing.

17          He rented an apartment.  He has been evicted five

18  times.  I provided the Court with copies of the eviction

19  notices from the courts out there, not just the notices, but

20  the eviction judgments.

21          During all this time when his financial situation is

22  gone, he doesn't even think of saying maybe I should cut an

23  edge, do something crooked.  I've got clients who have gone

24  through a fraction of what this man has, and all of a sudden

25  they're arrested while out on release, and they commit another

1   crime.  What were you thinking?  Well, I needed the money to

2   support, whatever.  Not this man.  This man hasn't done a

3   single thing in addition to the crime that he committed.

4          And we don't deprecate the seriousness of the offense

5   he's pled guilty to.  If anything, I've tried to tell him to

6   forgive himself a little more.  This man has been absolutely

7   rocked by it.

8          During the same period of time, you'd think that this

9   would be enough, but it's not.  He not only loses his job,

10  loses what was his education, because nobody in the area that

11  he's received his degree in will ever hire him within the

12  confines of what he's been trained and educated to do.  That's

13  gone.

14         He has four children.  It's an incredible situation.

15  His wife is working and he's at home taking care of the

16  children.

17         His 18-year-old son is a freshman in college.  He got

18  accepted at Stanford University and Berkeley, his 18-year-old

19  son.  They can't afford it.  He got a partial scholarship.

20  They can't afford it and they can't get any loans.  There is

21  no way to pay it back.  They don't have it.  So the young boy,

22  who has a 4.0 average, is at a junior college in California

23  doing tremendously.

24         Berkeley said any time you want to walk in, come on

25  in.

1    Now, this is a young man who has seen his father

2    destroyed, moved five times in five years from evictions --

3    seven years.  And yet Asif keeps telling him:  Let me be an

4    example of what not to do.  Get an education.  Value it.

11:47:38    5    Build on it.

6    And he was very straight.  He's been very honest with

7    his kids about what happened and why their family is

8    suffering.  Yet despite that, his oldest son, 4.0 average in

9    college.

11:47:53    10    His next son -- the older boy's name, by the way, is

11    Rameez, R-a-m-e-e-z.

12    Rahim is age 14.  I have a document that I provided.

13    His son is in the 9th grade.  He's rated number 28 out of

14    53,000 students in the Corona Valley School District, number

11:48:14    15    28 out of 53,000.

16    His younger son Saif, S-A-I-F, is currently in the

17    8th grade, top 10 percent of the entire school district, top

18    10 percent.

19    And then he has his youngest son Haris, who is 9

11:48:31    20    years of age.  The Court has, and I provided to the assistant

21    U.S. attorney, Haris's autism report.  He is severely at the

22    highest end of handicap.  Haris communicates by screaming for

23    hours at a time, this little boy screams.  He's not potty

24    trained, he never will be.

11:48:53    25    Asif has to carry a 9-year-old boy and move him

around, which is very difficult for Asif.  Asif has 11 stents,

11 stents, 4 heart attacks.  And his lungs are failing because

of the medication he's been taking.  And he's got to maneuver

his 9-year-old child because all day long while Asif's wife is

working, Asif is on different remote control systems making

sure that his kids are in school and getting something out of

it because, as we all know, the education that all kids in

America are going through now is either remote or the rare

occasion where they're in school.  But he can't let his kids

go out there, because if his children bring home a

coronavirus, he's a dead man.  He has to be as vigilant about

avoiding contact with people as a human can be.

        I'll take a side footnote to that.  For Asif to come

out here, Ms. North has been incredibly patient with me and

with my client.  And I extend to her a personal thank you.

And I mean that sincerely.

        Asif has had difficulty making it out here because of

his medical condition.  This time his doctor said there is no

way in the world that you can get on an airplane or a train.

        So Asif's brother flew out to California, drove Asif

to Chicago for this hearing today, stopping every two hours so

he could exercise and massage his legs because of the clotting

he has.

        Now, when this is over, unless the Court takes him

into custody, his brother has to drive him all the way back to

1    California.

2         During the course of this case, Asif left the United

3    States on two occasions with approval of the Court and

4    Pretrial Services.  He knew that he was facing imprisonment.

11:50:49    5    He came back.  On both occasions he came back a day or two

6    days earlier than he was expected to.

7         He has never been even considered as a flight risk.

8    He has never caused Your Honor or the Court system the

9    slightest bit of embarrassment beyond what he pled guilty to.

11:51:08    10   But he's not ever committed any act of violence in any way,

11   shape or form at all.

12        The crime that he's accused of, the crime that he's

13   committed is participating in a scheme in which mortgage

14   applications were lied about.  The content was falsely

11:51:28    15   provided as to where the down payment came from, and Asif did

16   that, and he made about 180 to 200,000.

17        In the report for this case that the government has

18   prepared, they indicated in there that they couldn't track the

19   money that Asif had for whatever reason.  Asif had in his

11:51:56    20   business three accounts:  one was his personal account, one

21   was a checking account, and one was an escrow account for his

22   real estate mortgage company.

23        There was nothing complex about it.  All the records

24   were given from Asif to the government.  And they subpoenaed

11:52:13    25   records from the banks themselves.  There was no

1    sophistication here.  Two of the points is added on to the 26

2    is for sophistication.

3            The Court knows better than I do, but it's stated

4    very clearly what is meant by sophisticated means.  Judge,

11:52:33   5    this is not a sophisticated case.  He filled out a lying

6    application form.  The people who do this can do this with a

7    high school degree, don't even have to have that to become a

8    mortgage broker and lie about where the money came from down

9    payment-wise.  There is nothing unique.  It didn't require

11:52:50  10    skill sets involving computer programming, international

11    banking operatives.  This is simple generic fraud.  They lied

12    and they shouldn't have.

13            So I'm suggesting with regard to the two points for

14    sophisticated means, I don't think that's appropriate, Judge.

11:53:06  15    This is not sophisticated.

16            With regard to the amount, well, Warren Barr may well

17    deserve every point that could be mustered, numbers that

18    aren't even known to the earth.  My client's involvement I

19    think should come down to the 18 point level, which would

11:53:27  20    bring him down 2 more points.  Instead of 20 for the amount of

21    money, it should be 18.

22            So I would argue that the points applicable to my

23    client should be the base level as suggested by the

24    government, 18 instead of 20 for the amount of money involved.

11:53:43  25    Sophisticated means should not be there.  And the acceptance

1    is well deserved, which instead of 26 points, as the

2    government has suggested, I believe that the most it should be

3    is 22 points.

4         A 22 point number under the Sentencing Guidelines Act

11:53:59    5    indicates that we'd be looking at numbers of 41 to 51 months

6    or 27 months on the low end of the two-third number that we

7    had previously discussed.

8         But I'm asking the Court this.  My client has had the

9    most horrific health issues.  And I've seen people come in

11:54:22    10   this very courtroom.  I did a case in front of you in 1992, I

11   believe it was.  We were sitting here watching people.  All of

12   a sudden healthy men were coming in dragging a green oxygen

13   tank.  Everybody questioned the need for that and the validity

14   of the situation.

11:54:45    15   My client had his first heart attack in December of

16   2012.  He had a second heart attack in May of 2016, a third in

17   July of 2016.  His fourth heart attack, which most men never

18   get to see their fourth, he got his on May of 2017.

19        He had two stents put in December 2012.  We have

11:55:10    20   given support for that.  He had a third stent put in in May of

21   2016.  He had three stents put in in July of 2016.  Another

22   stent put in in May of 2017.  They told him at that time the

23   likelihood of his being able to have anymore additional stents

24   was bad and his arteries were collapsing.

11:55:38    25   In February of 2019, despite that prior concern, they

took a risk and they put in three stents.  In July 22nd of
this year, he had stent number 11.

I have two stents.  It's a horrific kick in the tail
end.  And the problem with Asif is that the medication that
he's on to accommodate his coronary condition and the stents
leaves him with lung impairment now because he's on -- I'll
read you the list of what he takes on a daily basis.  And he's
got them with him.  He takes Vascepa; atorvastatin, which is
statin; clopidogrel, a thinner; pantoprazole; nitroglycerin on
a regular daily basis; albuterol, which is dissolving,
wrecking his lungs; something called Qvar, another inhaler;
Serevent Diskus and metoprolol and a couple others that
whoever made those up had a great sense of humor with the
names.

The point is that these medications now have attacked
his stomach lining.  They are dissolving his lungs.  And the
doctor hold him, well, you have a choice, if you abandon
medications, your stents aren't going to last.  Your heart
can't handle it.  You'll die of a heart attack.  If you don't
take them, your heart goes bad.  If you do take them, you're
killing your lungs.

He's 50 years of age right now.  Incarcerating him,
we're in a pandemic, the three worst places to be in a
pandemic, I was told by Dr. Malachinski, a doctor that I sent
his records to for consultation, Dr. Malachinski said to me:

1   There are three terrible places to be in a pandemic.  The

2   worst three places:

3        A college dormitory, because young people don't

4   listen and they like to congregate.

11:57:50   5        Second is a military barracks, because they have to

6   congregate, it's all about bringing them down to a common

7   denominator and putting them in close quarters.

8        And the third and the worst is the prison system,

9   because you're in the tightest closed quarters.  You have no

11:58:07   10  control over seeking medical attention.  The medical attention

11  you get is usually on a bad ratio of prisoner to medical

12  attendant.  And the medication you get is always the bottom of

13  the barrel.

14        If my client is sentenced to jail you might as well

11:58:23   15  shoot him here.  This man is not going to make it through any

16  sentence.

17        I am begging this Court to realize that what you and

18  I have seen, we have seen over the past 40 years through the

19  '80s and '90s when it was thought that harsher sentences would

11:58:39   20  somehow control crime realize that prison is not the answer

21  for everybody.  Everybody that breaks a rule should not be

22  sent to prison.  It didn't work in the '90s especially.  We're

23  seeing it didn't work and we're making steps and taking steps

24  to correct some of that.

11:58:57   25        That's why they don't have a machine in a court.

11:59:20

1    They have a human being.  And that's why you as the Judge

2    looked over the years and you say what you think is best from

3    the standpoint of punishing my client, making sure that

4    whatever is meted out by the Court acts as a deterrent to

5    others and that it fairly represents society's reaction to a

6    wrong committed.

7         Some punishments come about for inexplicable reasons.

8    Has my client been punished?  Well, my client has suffered.

9    And if he just had these medical conditions, and it was

11:59:42    10   unrelated to this case, I would say, well, you know, just

11   because you suffer doesn't mean you've been punished.  And so

12   there has to be some relationship to what you did here.

13        But the punishment that Asif Aslam has suffered and

14   will forever suffer is as a direct result of what he did

12:00:02    15   wrong.

16        His entire education is gone, his image and status in

17   his family, his extended family, his image before his

18   children, his image in the community.  He was a very well

19   respected man at one time.  He has no friends.  He has no

12:00:20    20   life.  He has no income.  He's never going to get a trusted

21   position.  He brought that on himself, and it is a punishment

22   that he is serving everyday.  It would go and transcend long

23   after you're done with him, Your Honor.

24        I can say this to you.  In the many, many years that

12:00:42    25   this has been going on, this case started technically in 2007,

1  we're looking at 13 years, this man was involved in one bad

2  offense.  Nobody was physically harmed, thank the Lord.  There

3  was no violence at all, no weapons involved.  The probability

4  of recurring is zero.

12:01:01

5  He was not involved in anything before this, hasn't

6  been involved in anything since then.  Pretrial Services knows

7  him very well.  They've been out to some of the places he

8  lived at.  They know what he's gone through.  And despite all

9  he's gone through, he's done nothing to try to improve his

12:01:17

10  position or that of his family other than work hard and try to

11  make his children become good citizens of America, all born in

12  America, American citizens.

13  And I ask the Court this, if the Court could see it

14  in its heart, and I mean this sincerely, Judge, to give this

12:01:35

15  man some sentence that avoids sending him to a prison, it's a

16  killer to him.  Give him electric home monitoring.  Give him

17  home confinement.  Give him something that he can, even if

18  it's tutoring other children, because he clearly has a knack,

19  what he's brought about with his own four kids.  I'm

12:01:57

20  embarrassed to say, I wish my children had done as well.  I

21  love my kids, they're good kids, but they certainly haven't

22  been as accomplished as this man's kids have been.

23  So whatever he's doing with his kids, please don't

24  interrupt that.  Don't interfere in that.  They need him.

12:02:14

25  I have pictures I could show the Court.  Here is one.

1    Standing up with his kid with a very recent accolade, an award

2    that his son received.  He is very close.  I gave some

3    pictures to the Court.

4         You can see -- I've seen staged pictures where people

12:02:35    5    are standing next to one another and you can -- there might as

6    well be a mile between them.  I see pictures of him and his

7    kids and they're natural, and you can see there is a love

8    between the kid, the kids and the father.

9         I'm asking the Court to give this man a chance to at

12:02:51    10   least renew his image with his children.  He'll never renew

11   his image in the public.

12        Now, he has a job offer from a company in California

13   that will allow him to work part-time as an office manager in

14   a used car place near where he lives.  So he said he could go

12:03:14    15   over there after his wife gets home and put in a few hours to

16   try and get a job, because they're financially in terrible

17   shape.

18        His wife is not a highly educated individual.  They

19   do as well as they can, but they are struggling.  But at least

12:03:31    20   they haven't been evicted in the past two years since his wife

21   has gone to work and Asif has taken care of all four children.

22        He takes care of the house.  He takes care of

23   everything at the house, including, most importantly, his

24   kids.  So I ask you, I beg of you, craft a sentence, whether

12:03:52    25   it's if you sentence him according to the guidelines I

1    calculate, it's 27 months, the government's calculation is 42

2    months, it's a gigantic amount of time.

3              In the system we have today, and let's be frank,

4    Judge, despite all the political wrangling back and forth

12:04:11    5    about how successful we are with the coronavirus, we are no

6    closer to a vaccine today than we were six months ago.  And

7    even if they had one, he can't take a vaccine.  His medication

8    would not allow him to.  He stands at risk of the slightest

9    thing coming into him and it's goodbye Asif.

12:04:33   10              So I'm asking you to take his health into

11    consideration, take into consideration the fact that he has

12    caused himself punishment directly related to what he did.

13    It's not God's hand having him get hit by a car.  This is Asif

14    Aslam used his position, used his education, committed fraud,

12:04:57   15    admitted it right away, admits it here now, and stands ready

16    to be punished.  But I'm begging you, don't put this man in

17    jail.  Thank you, Judge.

18              THE COURT:  The government may respond.

19              MR. GOODE:  Again, thank you very much for your

12:05:10   20    kindness.

21              THE COURT:  The government may respond.  And then

22    we'll give the defendant an opportunity to speak.

23              MS. NORTH:  Thank you, Your Honor.  It seems that Mr.

24    Goode spoke about both the guidelines and the 3553 factors, so

12:05:24   25    I intend to do so as well if that's all right.

1          THE COURT:  Yes.

2          MS. NORTH:  Focusing on the enhancements that the

3    government asked for in this case, particularly the

4    enhancement to add 20 to the offense level for the loss

12:05:37    5    amount, the defendant's arguments are essentially that he did

6    not receive the $11 million himself.  But, of course, that is

7    not what the enhancement requires.

8          He referred to, Mr. Goode referred to it as a

9    gigantic amount of money.  It certainly was a gigantic amount

12:06:00   10    of money that was lost in this case.  And it is the loss that

11    is what goes into determining that enhancement.  So the

12    government considers that 20-level enhancement appropriate in

13    this case.

14          I'd also like to talk a little bit about the

12:06:12   15    sophisticated means enhancement here.  It was said that this

16    was a garden variety mortgage fraud case in which there were

17    lies made on mortgage applications.

18          Well, it was much more complicated than that.  And

19    Mr. Aslam's role in it was much more complicated than that.

12:06:30   20    Not only did he recruit the straw buyers, but he set up the

21    system or he participated in the system in which his

22    co-defendants transferred money into Mr. Aslam's bank accounts

23    because he was a sophisticated businessman in the real estate

24    business.  And then he facilitated having cashier's checks

12:06:55   25    drawn that had straw buyers listed as remitters, even though

1   they were not, to bring with them to the mortgage closings.

2       And so this was not a simple, I think as it was put,

3   as somebody with a high school education, oh, I just wrote a

4   lie on a mortgage application.  It was much more complicated

12:07:16   5   than that.  And he used financial instruments in ways that

6   make the sophisticated means enhancement appropriate.

7       The government, of course, agrees that there has been

8   substantial assistance in this case, and that is why we made

9   the motion that we made earlier.  And, you know, I don't

12:07:35   10   dispute any of the facts that Mr. Goode laid out, some of the

11   things he references I was not present for, but in general, he

12   did provide substantial assistance, was interviewed multiple

13   times, provided information regarding co-defendants that was

14   very useful.

12:07:51   15       So putting all that together makes us reach an

16   offense level of 26 with the guideline range we discussed

17   before of 63 to 78.  But then, of course, we made the motion

18   to reduce the appropriate sentence to a term of imprisonment

19   of 42 months.

12:08:13   20       And I'd like to turn a little bit to some of the

21   arguments made that really fit under the 3553(a) factors,

22   particularly the idea that Mr. Aslam relied upon his

23   co-defendant Warren Barr to go through with this thinking it

24   was not okay -- or thinking it was okay in some fashion.

12:08:39   25       We have a plea agreement in this case.  And in the

1    plea agreement Mr. Aslam signed, he said that he knowingly

2    participated in a scheme to defraud a financial institution

3    and to obtain money and funds owned by and under the custody

4    and control of a financial institution by means of materially

5    false and fraudulent pretenses, representations and promises.

6        He also stated in this plea agreement more

7    specifically that he knew that the sales prices of the

8    condominium units were falsely inflated.  He knew that the

9    inflated sales prices and the payments to the buyers and to

10   Aslam were not disclosed to the lenders financing the mortgage

11   loans.  He knew that fraudulent loan applications for buyers

12   were submitted to lenders in order to qualify the buyers for

13   mortgage loans.

14       And the sort of sophisticated financial scenario that

15   I described before is also in the plea agreement.  It's in the

16   description of how the sale of two of the units that are

17   specifically discussed in here, how that occurred.  And so

18   he's admitted to all of this.

19       And as presented I think in the presentence report

20   and here today, Mr. Aslam was a sophisticated businessman

21   himself.  And so the notion that he thought this was okay, it

22   doesn't match his plea and it doesn't match the facts

23   surrounding who he is.

24       THE COURT:  All right.  The Court agrees with you on

25   that point.  And I already with respect to co-defendants

1    determined that sophisticated means were used by those various

2    defendants during the course of the efforts to defraud the

3    banks.

4            MS. NORTH:  Okay.  Thank you, Your Honor.

12:10:27    5       With respect to the personal circumstances, situation

6    and health of Mr. Aslam, we have no disputes on the facts of

7    those things.  Of course, the Court may take those things into

8    consideration in determining a sentence here.

9            But I do want to say with respect to the situation in

12:10:48   10    the Bureau of Prisons with coronavirus, there are ways to

11   address that, such as a long report date and things of that

12   sort, you know, sort of post pandemic to the extent we can

13   know that, that can address any concern about that.  But also

14   the situation in many of the facilities is not as dire as has

12:11:13   15    been painted here today.

16           I also wanted to talk a little bit or just make sure

17   we address restitution.  I didn't know if this was the

18   appropriate time or if you wanted to --

19           THE COURT:  Certainly you can proceed on that issue.

12:11:29   20           MS. NORTH:  Okay.  Thank you.

21           So restitution in this case, while it was originally

22   agreed to in the plea agreement, and then because during

23   certain sort of foreclosure processes and fees that occurred

24   has been slightly updated, and I have provided Mr. Fulbright

12:11:43   25    with an updated spreadsheet to that effect, but the

1    restitution that's appropriate is $11,417,592.

2        THE COURT:  And would you recommend that it be paid

3    at 10 percent of his income?

4        MS. NORTH:  I'm sorry, say one more time.

12:12:00    5        THE COURT:  Would you also recommend that it be paid

6    at the rate of 10 percent of his net monthly income?

7        MS. NORTH:  Yes, Your Honor.

8        THE COURT:  That would take about 200 years, wouldn't

9    it?  Proceed.  Proceed.

12:12:16   10        MS. NORTH:  It may, Your Honor.  Also that is a joint

11   and several amount --

12        THE COURT:  Yes.

13        MS. NORTH:  -- with four of the other defendants in

14   this case.

12:12:23   15        THE COURT:  Are you aware that I was the sentencing

16   judge with respect to all the defendants?

17        MS. NORTH:  Yes, Your Honor.  I am, Your Honor.  I'm

18   sorry if I'm --

19        THE COURT:  No.  You're making a good record on the

12:12:34   20   point.

21        MS. NORTH:  Okay.

22        THE COURT:  And with respect to Mr. Barr, his

23   conviction was affirmed on appeal --

24        MS. NORTH:  Correct.

12:12:40   25        THE COURT:  -- as you are no doubt aware.

1       MS. NORTH:  I am very aware of that, Your Honor.

2       THE COURT:  All right.  Please proceed.

3       MS. NORTH:  Your Honor, I believe those are all my

4  points in response to Mr. Goode.

12:12:56    5       THE COURT:  All right.  Thank you.

6       MS. NORTH:  Thank you.

7       THE COURT:  Mr. Aslam, how do pronounce your name?

8       THE DEFENDANT:  Asif Aslam.

9       THE COURT:  All right.  You have the right to make a

12:13:06   10  statement to the Court before the sentence is imposed.  You

11  also have the right to remain silent, which means to say

12  nothing.  If you do wish to speak, this is your opportunity.

13  And if you are having some difficulties in standing, you may

14  be seated as you make your statement.

12:13:24  15       THE DEFENDANT:  Thank you, Your Honor, for the

16  opportunity.  I'll try my best to convey my thought process.

17  I'm going to be very brief because I cannot breathe and am

18  losing breath.

19       The only thing I am going to tell to this Court and

12:13:48  20  to you, Your Honor, the fact that I'm extremely sorry for the

21  role I played.  And I apologize to the citizens of Chicago

22  that have suffered due to my acts.  I apologize to the

23  government of the United States.  And I apologize to you, Your

24  Honor.

12:14:14  25       And the amount of suffering as my attorney already

explained has no room to repair it.  The only thing left in my

life, my mom's two brothers, one died because of the heart

attack at the age of 57, the other died at the age of 56, so

factoring that, I probably have five or six years left in my

life.

My focus only is on my kids now.  My wife is only

high school.  Because of this, honestly, I hate money, that is

not the objective of my life.  My objective is, I can only

become a respectable and responsible citizen, but I've devoted

my time to produce at least three more decent and respectable

and honest citizens of this country.

My fourth child, I have no idea what is going to

happen to him.

So that's, that's all I'm going say.

THE COURT:  That's the 9-year-old you are speaking

of?

THE DEFENDANT:  I'm sorry?

THE COURT:  That's the 9-year-old child you are

speaking of?

THE DEFENDANT:  Yes, sir.

THE COURT:  Well, what would happen to him if you

were to be incarcerated?  Who would deal with him?  Who would

take care of him?

THE DEFENDANT:  That means my wife would have to quit

her work and then --

1    THE COURT:  What does your wife do for a living?

2    THE DEFENDANT:  She is -- she's getting the -- it's

3 called IHSS.  It provides services just like my son to other

4 kids, too.  So in-home services something.

12:16:14 5    THE COURT:  In a very practical sense, when you get a

6 paycheck, if you do, at the end of the week, how much is it

7 for?

8    THE DEFENDANT:  Total, she does --

9    THE COURT:  As to you, you, and then I'll ask about

12:16:26 10 your spouse.

11    THE DEFENDANT:  I'm sorry, what?

12    THE COURT:  When you get a paycheck at the end of the

13 week or at the end of the month, how much is it for?

14    THE DEFENDANT:  I'm not working, sir.

12:16:35 15    THE COURT:  You're not working.  When did you last

16 work?

17    THE DEFENDANT:  20 -- I think 2017 or '18.  2017.

18    THE COURT:  How would you propose to make

19 restitution?

12:16:47 20    THE DEFENDANT:  As I mentioned, I'm going to have

21 nothing.

22    THE COURT:  Now, with respect to your spouse's

23 income, how much does she earn on a weekly or a monthly basis?

24    THE DEFENDANT:  I think she makes 2800.

12:17:02 25    THE COURT:  A week or a month?

1          THE DEFENDANT:  A month.

2          THE COURT:  All right.  About 30, $35,000 a year

3     roughly?

4          THE DEFENDANT:  That's correct.

12:17:08    5          THE COURT:  And you're renting an apartment, right?

6          THE DEFENDANT:  I'm living with my brother-in-law.

7     We cannot afford.  So he's renting.  So we live with him.

8          THE COURT:  Okay.  So your entire family lives with

9     your brother-in-law?

12:17:22   10          THE DEFENDANT:  Yeah, brother-in-law for now.

11          THE COURT:  Because you cannot afford to live

12     independently?

13          THE DEFENDANT:  Right.  He works for --

14          THE COURT:  What are your prospects as you see it in

12:17:30   15     the future for obtaining any additional assets or any

16     improvement in your income?  How do you see the future?

17          THE DEFENDANT:  Your Honor, my credit is shot.

18     Nobody gives me a job.  I mean, up until 2012 to 2017, my

19     family gave me the money, my brother-in-law gave me the money,

12:17:52   20     but they ran out now, so that we could get by.

21          So I'm in -- I tried to get into a labor union, but

22     because of my heart situation, physically, I cannot.  But they

23     pay good money and even to ex-cons, but because of that I

24     couldn't.  So I'm blank.  I don't know.

12:18:14   25          THE COURT:  With respect to your medical care and

1  treatment --

2          THE DEFENDANT:  Yes, sir.

3          THE COURT:  -- are all of those medications

4  prescribed by one doctor or several doctors?

12:18:22  5          THE DEFENDANT:  To my primary, to my cardiologist, so

6  two, two different doctors.

7          THE COURT:  Two doctors prescribing all those

8  medications that Mr. Goode has read into the record?

9          THE DEFENDANT:  That's correct, right.

12:18:35  10          THE COURT:  And you take all of that daily?

11          THE DEFENDANT:  Daily.  I have to.  I just took three

12  nitroglycerins because I was feeling chest pain just now.  And

13  I carry two of them always in my pocket.

14          THE COURT:  Now, with respect to your child who is

12:18:51  15  autistic, he is presently 9 years old?

16          THE DEFENDANT:  9 years old, sir.

17          THE COURT:  Okay.  And he's incontinent?

18          THE DEFENDANT:  Uh-huh.  No speech.  Not potty

19  trained.

12:19:03  20          THE COURT:  So that involves wearing diapers in one

21  form or another?

22          THE DEFENDANT:  Yes.

23          THE COURT:  And you are the caretaker?

24          THE DEFENDANT:  Yes.

12:19:09  25          THE COURT:  And so you stay home, take care of the

1    children while your spouse does work?

2             THE DEFENDANT:  Yes.

3             THE COURT:  Which you referred to earlier.

4             THE DEFENDANT:  Yeah.  And then --

12:19:18   5             THE COURT:  If you went to prison, what would be the

6    effect on your family?

7             THE DEFENDANT:  I'm afraid they're going to be on the

8    roads, on the street, because she has to quit her job to take

9    care of that child and then move around the kids when the

12:19:39  10    schools open up.

11             But she won't be able to focus.  She doesn't have

12    that kind of educational level, because now they're growing

13    and they're into colleges and high schools.  Mathematics,

14    computer science, physics, she is not capable of handling

12:19:52  15    those.

16             THE COURT:  So you have no assets, and you are

17    unemployed?

18             THE DEFENDANT:  Yes.

19             THE COURT:  And your only source of income is your

12:19:58  20    spousal income?

21             THE DEFENDANT:  Yes.

22             THE COURT:  Do you have medical -- how is it that you

23    cover your medical expenses?

24             THE DEFENDANT:  Through IEHP, which is California's

12:20:10  25    care insurance program.

|  |  |  |
|---|---|---|
|  | 1 | THE COURT:  So that covers the cost of seeing doctors |
|  | 2 | and obtaining medical prescriptions and so forth? |
|  | 3 | THE DEFENDANT:  So we don't have income or we are |
|  | 4 | below the poverty line.  So I think the program is to cover |
| 12:20:30 | 5 | all the children and then they automatically provide the |
|  | 6 | insurance to the parents. |
|  | 7 | THE COURT:  So the state of California does that? |
|  | 8 | THE DEFENDANT:  Yeah.  It's IEHP, Inland Empire |
|  | 9 | Health Plan. |
| 12:20:48 | 10 | THE COURT:  I want to provide an opportunity to the |
|  | 11 | Probation officer to make any comments or to update the |
|  | 12 | information contained in the report of 2017. |
|  | 13 | Let me at least put this to you.  As the Probation |
|  | 14 | officer, is your view of the case consistent with what Mr. |
| 12:21:07 | 15 | Goode has said and what the defendant himself has said? |
|  | 16 | PROBATION OFFICER:  My view of the case in regard to |
|  | 17 | the defendant's character? |
|  | 18 | THE COURT:  Yes. |
|  | 19 | PROBATION OFFICER:  Yes, I believe that's accurate. |
| 12:21:17 | 20 | THE COURT:  So with respect to his financial |
|  | 21 | condition and medical condition and so forth, from the |
|  | 22 | Probation department's position, you regard that as reliable? |
|  | 23 | PROBATION OFFICER:  As reliable? |
|  | 24 | THE COURT:  As reliable. |
| 12:21:31 | 25 | PROBATION OFFICER:  Yes, correct. |

|        |    |                                                                    |
|--------|----|--------------------------------------------------------------------|
|        | 1  | THE COURT:  Okay.  And one of the recommendations in               |
|        | 2  | your report is that if he would be placed on supervised            |
|        | 3  | release, that he would be making restitution.  And what            |
|        | 4  | specifically have you said?  That's the 10 percent, right?         |
| 12:21:47 | 5  | PROBATION OFFICER:  Correct.                                      |
|        | 6  | THE COURT:  Okay.  I have that before me.  I'm simply              |
|        | 7  | trying to make the record on this.                                 |
|        | 8  | PROBATION OFFICER:  Yes.                                           |
|        | 9  | THE COURT:  The defendant does not certainly have the             |
| 12:21:54 | 10 | ability to pay a fine.                                           |
|        | 11 | PROBATION OFFICER:  Correct.                                       |
|        | 12 | THE COURT:  He has no income and no assets.                        |
|        | 13 | PROBATION OFFICER:  Yes.                                           |
|        | 14 | THE COURT:  Okay.  Do the ends of justice require the             |
| 12:22:07 | 15 | government to proceed in this case?                              |
|        | 16 | THE DEFENDANT:  Can I sit down, Your Honor?                        |
|        | 17 | THE COURT:  Yes, please.                                           |
|        | 18 | PROBATION OFFICER:  Yes, Your Honor.                               |
|        | 19 | THE COURT:  Let me put it another way.  Is there                  |
| 12:22:20 | 20 | anything more you want to say?                                   |
|        | 21 | PROBATION OFFICER:  No, Your Honor.                                |
|        | 22 | THE COURT:  Okay.  Mr. Goode, anything more?                       |
|        | 23 | MR. GOODE:  Yes, Judge.  I've spoken to Asif about                |
|        | 24 | what he planned to do as well.  And he did show me a letter        |
| 12:22:36 | 25 | where he had been speaking to a company that owns -- I can't     |

1    remember, something motor.  It's a used car dealership near

2    his home.  It's an office there.  And he said he was very,

3    very candid with them, let them know what his background was.

4    And they said, they were very nice to him, they said, Look, if

5    you're not going off to jail, you want to work part-time here,

6    you can do so.

7         They said we would do it based on an hourly.  And the

8    letter I saw told him that he would earn $3500 a month gross

9    if he were full-time.  He told them he cannot work full-time

10   because of his children and the family obligations.

11        But my point in bringing it up is that whatever he

12   makes, I'm sure he would give that money towards restitution.

13        But the reality is, Judge, as you very

14   straightforward pointed out, the amount of money here, and one

15   of the reasons I didn't get into the details, is it 9 million,

16   is it 7 million, is it 5, it doesn't matter.  It's a

17   tremendous sum of money for a man who has reasonable

18   employment to be yoked under.

19        Is there a likelihood of him being able to satisfy

20   the restitution in full?  Unless he lives to be a very, very

21   old person is not realistic.  But I think the Court could

22   impose -- this is a man who wants to go back to work, wants to

23   contribute to the family somehow.  If he does, I think that

24   the Court could impose some obligation on him at that time or

25   put it in now so that he has a duty, and he would tell the

1    Court, he would come and let people know, I've got a job now,

2    here is my percentage.  If he had it, he would give it.  I

3    believe that.

4          Let me say this, Judge.  My office has handled this

12:24:25    5    case pro bono because I believe the man made a mistake.  We

6    have not walked way.  He has never paid us 5 cents in this

7    case.  And I believe that people in this world need a hand

8    sometimes.  They need a second chance.  And he does.  Anything

9    short of that is a death sentence.

12:24:44    10          THE COURT:  How much time has your client spent up

11    custody?

12          MR. GOODE:  How much time what, Judge?

13          THE COURT:  Has your client spent in custody.

14          MR. GOODE:  I don't know that he's spent any time in

12:24:51    15    custody.  No, he did not.  When they called him in, just to

16    discuss the case with him, he had been referred to me, I went

17    with him that day, we had a meeting, set up a series of other

18    meetings, and he answered every question then and there.

19          THE COURT:  Well, he went through the booking

12:25:09    20    procedure, is that right?

21          MR. GOODE:  He did go through booking.

22          THE COURT:  And he was then released on bond by

23    myself or by the magistrate judge?

24          MR. GOODE:  You did, Judge, you released him.

12:25:16    25          THE COURT:  I did.

1        MR. GOODE:  You released him.

2        THE COURT:  And he has certainly complied with each

3   and every condition of the release order?

4        MR. GOODE:  Absolutely, Judge.  Absolutely.

12:25:23   5        THE COURT:  All right.  This is an interesting case

6   because the events, as Mr. Goode has pointed out, go back to

7   2007 or even earlier, and so we're talking about things that

8   happened 13 years ago.

9        MR. GOODE:  I had hair then.

12:25:46  10        THE COURT:  And so the indictment was in 2014, which

11  is 6 years ago.  And the defendant has been on release,

12  subject to the release order over that period of time and has

13  been exemplary.  There has been no negative information

14  whatsoever.

12:26:10  15        As you pointed out, he even left the country and

16  returned.  Certainly he given the circumstances would have had

17  an opportunity to flee if he decided to do so and he did not.

18        He entered a plea of guilty in the very beginning and

19  cooperated with the FBI.  I don't know what more he could have

12:26:34  20  done in terms of cooperation.  And the government has

21  recognized that by making a 5K1.1 motion for departure, which

22  I have granted.

23        In looking at the entirety of the information before

24  the Court, personal deterrence certainly is not an issue in

12:26:55  25  this case.  The defendant has demonstrated that there is no

1    need to impose certain conditions of even probation or

2    supervised release which would require his compliance because

3    essentially what he has done he has done voluntarily.

4            Even to the extent that Probation has not written a

5    report for some three years, which is a clear demonstration

6    that he has become a law-abiding citizen and who has

7    experienced tremendous social and personal difficulties.

8            He certainly is to be commended, and I think that he

9    would not be the first person to ask for commendation, but to

10   be commended for what he has been doing to take care of his

11   9-year-old autistic child even to the point of diaper-changing

12   and everything that would go with it.

13           He has attempted to be employed, even to the point of

14   selling used cars.  He at the same time is doing his best to

15   take care of his entire family.  He is blessed by a spouse who

16   has been working and providing some income for the family.

17           He has no assets.  He's living with relatives.  And

18   the care of his autistic child is such that it presents

19   difficulties for everyone within the household, accepting as

20   truth that the autistic child, the 9-year-old screams

21   constantly during the course of the day and I suppose the

22   night.  So these are very difficult conditions with which he

23   has been dealing.

24           If he were to leave, to leave the home, it would

25   present a tremendous burden on his spouse and family, and they

1    are already heavily burdened.

2    And so I don't see how society or anyone or even the

3    victims in this case would in any way benefit by imposing a

4    sentence that would put the defendant into the Bureau of

5    Prisons.  Personal deterrence is certainly not an issue here.

6    The various co-defendants have been dealt with, and

7    orders of restitution jointly and severally have imposed with

8    respect to them.  So if there is any potential for victim

9    recovery in this case, it would come from the co-defendants.

10   And certainly it is unrealistic to find that the

11   defendant here would be able to make any, any amount of

12   restitution, even at the 10 percent, because he has no income.

13   And I would not certainly impose 10 percent of the spouse's

14   income in order to make restitution, because she and the other

15   family members are innocent third parties and have had nothing

16   whatsoever to do with the improprieties committed by the

17   defendant in this case.

18   The general deterrence factor is certainly something

19   the Court must deal with because we're talking about millions

20   of dollars.  But in terms of general deterrence, if anyone in

21   society were to know of or learn of or read the record of what

22   has happened to this man since he committed these wrongs going

23   back to 2007 and 2008, that would be enough of a deterrence,

24   without even mentioning that if you take millions of dollars,

25   you would go to jail.  He has been punished as a result of

1    what has happened here or suffered.  I won't go into the

2    differences that Mr. Goode has pointed out philosophically

3    between punishment and so forth.

4         So I cannot convince myself that justice requires

5    that this man go to jail.

6         His health condition is such, taking all of that

7    medication and being treated by two doctors, would also place

8    a great burden on the Bureau of Prisons.  Now, that's a hard

9    thing for a federal judge to say.  But he is constantly in

10   need of medical care and treatment.  He is taking those

11   various medications.

12        Mr. Goode points out that he has already 11 stents

13   within his body, has suffered multiple heart attacks.  And the

14   defendant's placement would be in the Bureau of Prisons at

15   some institution that would be required to carry the burden of

16   taking care of this person at great expense and at great risk.

17        And there is no doubt in my mind that the Bureau of

18   Prisons could provide reasonable care for this man, that they

19   do have the ability to provide reasonable medical care because

20   of their relationships with hospitals and so forth, such as

21   the Rochester clinic or other medical institutions.  So they

22   could provide what he needs, but the cost of it and the burden

23   on him and others would be tremendous.  And we must look at

24   that in relationship to what this man did some 13, 12 or 13

25   years ago.

12:31:37

12:32:03

12:32:26

12:32:53

12:33:18

1          So I cannot convince myself that an order that would

2    put him into the Bureau of Prisons would be an appropriate and

3    fair sentence in the case.

4          The Court must never lose sight of the individual

12:33:34    5    before the Court.  And we can talk about sentencing

6    guidelines, sophisticated means and so on, but there is a

7    human being before the Court who has suffered greatly and has

8    demonstrated that he can abide by the law, take care of

9    himself and take care of his family.  He has no assets and no

12:33:57   10    income.

11          The government's argument here for a sentence is

12    understandable and reasonable, and I certainly don't mean to

13    be critical of it.  But there is no reasonable basis to

14    believe that the defendant in this case could make any

12:34:19   15    significant payment in terms of restitution, while at the same

16    time as I have pointed out co-defendants might have a better

17    ability to do that.  So there is the potential for some of the

18    victims here, banks and so on, to get some form of

19    restitution.

12:34:37   20          So he cannot pay a fine.  He cannot make payments

21    with respect to restitution, whatever that figure might be,

22    10, 12 or $14 million.  There is no gain under those

23    circumstances to require an order of restitution in the case.

24          So what then is left?  The government has decided

12:35:02   25    from their perspective that the case should move forward.  It

1   is reasonable for them to make that recommendation.  It's a

2   discretionary call by the United States Attorney, and he has

3   decided to proceed with the case.

4           And so the judgment of the Court is that the

5   defendant will serve one day in jail.  He has done that in

6   terms of the day he submitted to custody, went through the

7   booking process and was released on bond.

8           And so it is the judgment of the Court that the

9   defendant is sentenced to one day in custody with credit for

10  time served.

11          There are no conditions of supervised release imposed

12  by the Court.  The Court has considered probation.  That too I

13  feel is unreasonable.  And so this case is closed with the

14  judgment of one day in custody.

15          And the defendant has the right to appeal this

16  judgment.  He must file the notice of appeal within 14 days if

17  he intends to do so.  If he cannot afford an attorney for

18  purposes of the appeal, the Court may appoint an attorney to

19  represent him.

20          I understand the government's position may disagree

21  with the Court's.  And the assistant U.S. attorney in this

22  case has functioned very professionally and reasonably and has

23  made a good case, which the Court, however, is not accepting.

24          The Probation department has indicated that her

25  information such as it is, it's consistent with everything

1   that Mr. Goode has been saying, and it is affirmed also by the

2   defendant himself, who has made the statement under oath in

3   court.

4          That concludes the case.  Thank you.

12:36:54  5          MR. GOODE:  All I can say is from the bottom of my

6   heart thank you very much.

7          THE COURT:  That was completely unnecessary.

8          MR. GOODE:  I mean it.  Thank you very much.

9          PROBATION OFFICER:  Excuse me, Your Honor.  I know

12:37:09  10  this might just be semantics and no further way to go about

11  this, him not being ordered to be on supervised release, but I

12  believe mandatorily restitution has to be ordered by statute.

13  I don't know.  It's a 3663A situation.

14         THE COURT:  Well, dura lex sed lex.  The law is hard,

12:37:34  15  but it is the law.

16         PROBATION OFFICER:  Yes.

17         THE COURT:  And if that is the law, and I will accept

18  your position on that, the Court does order that he make

19  restitution.

12:37:45  20        PROBATION OFFICER:  Okay.

21         THE COURT:  But I'm not placing him on supervised

22  release.

23         PROBATION OFFICER:  Okay.

24         THE COURT:  It is simply an order jointly and

12:37:51  25  severally to make restitution.

|  | 1 | The report of 2017 indicates restitution of |

1     The report of 2017 indicates restitution of

2     $14,134,841.  Mr. Goode might dispute that.  And so I'll

3     accept Mr. Goode's position and order that the restitution be

4     jointly and severally with respect to this defendant of $10

12:38:15    5     million.

6     PROBATION OFFICER:  So you are only ordering

7     restitution for this defendant for $10 million?

8     THE COURT:  That is correct.

9     PROBATION OFFICER:  And then what --

12:38:25   10     THE COURT:  Jointly and severally.  Now, if the other

11     co-defendants have already paid the money, highly unlikely, he

12     would not have to pay it.

13     PROBATION OFFICER:  And then --

14     THE COURT:  I want to repeat again, I am not imposing

12:38:38   15     supervised release.

16     What is the other point?

17     PROBATION OFFICER:  The $100 special assessment.

18     THE COURT:  The $100 special assessment, yes, indeed.

19     And that would be payable within 60 days.

12:38:49   20     PROBATION OFFICER:  That's all I have from Probation.

21     THE COURT:  I will also add that your client from

22     what you've said earlier will be returning to California,

23     where he lives with his family, is that right?

24     MR. GOODE:  That is correct, Judge.

12:39:00   25     THE COURT:  Do you expect that he will return by

1    automobile?  He came here by automobile.

2              MR. GOODE:  He is going back by automobile.  When?

3              THE COURT:  All right.  Well, we wish him well.  That

4    concludes the matter.

12:39:11    5              MR. GOODE:  Thank you, Judge.  Thank you very much.

6         (Proceedings concluded)

7                        C E R T I F I C A T E

8              I, Jennifer S. Costales, do hereby certify that the

9    foregoing is a complete, true, and accurate transcript of the

10   proceedings had in the above-entitled case before the

11   Honorable CHARLES R. NORGLE, one of the judges of said Court,

12   at Chicago, Illinois, on November 4, 2020.

13

14                        */s/ Jennifer Costales, CRR, RMR*

15                        Official Court Reporter

16                        United States District Court

17                        Northern District of Illinois

18                        Eastern Division

19

20

21

22

23

24

25